Cause No

| | |
|---|---|
| STEVEN FILS, | IN THE DISTRICT COURT |
| PETITIONER, | |
| v. | |
| LOUIS DEJOY, | DISTRICT OF NEW JERSEY |
| POSTMASTER GENERAL, | |
| UNITED STATES POSTAL SERVICE | |
| (Field Areas and Regions), | |
| AGENCY | JURY TRIAL DEMANDED |
| DEFENDANT | |
| | January 24, 2023 |

**PETITIONER'S ORIGINAL PETITION**

**I. Jurisdiction and Venue and Procedural History**

This cases arises out of New Brunswick, Middlesex County, New Jersey. This is within the jurisdiction of the Third Circuit United States Court of Appeals. This region also falls within the jurisdiction of the Federal District Court of the District of New Jersey. This case arises under Title VII of the Civil Rights Act of 1964, authorizing the Equal Employment Opportunity Commission ("EEOC") to first review it, so it initially fell within the auspices of the EEOC Administration and its Administrative Judges. This region falls within the EEOC New York District Office, which Administrative Judge denied relief. From there, pursuant to 29 C.F.R. Section 1614.403(a), the EEOC Office of Federal Operations conducted an appeal, and while also denying relief, then authorized on

PETITIONER'S ORIGINAL PETITION                                                                1

November 10, 2022 filing in District Court within 90 calendar days, by February 8, 2023. Thus, this Original Petition is now being filed in the District Court of the District of New Jersey.

## II. Introduction

This is Mr. Fils's first chance to present his account of events, as previous EEOC and USPS procedures were wholly inadequate to establish any factual grounds from his perspective. Notably, both the Administrative Judge and Office of Federal Operations ignored Mr Fils's statement of facts altogether and used only USPS's Statements of Fact.

Mr. Steven Fils ("Petitioner") started work at the United States Postal Service ("USPS" or "Defendant") on October 6, 2014. He made sure to immediately bring up his religious observance as an Orthodox Jew, and was assured that such observance would of course be no problem. Upon his being assigned to the USPS New Brunswick, NJ Annex, he also immediately presented the Postmaster, Sandra Butler ("Sandra"), this same declaration of religious observance, accompanied by a 16 month Jewish calendar covering 2014-2015 and fully detailing all Jewish holidays throughout the year and their corresponding start times in the day, along with Petitioner providing oral explanation. Sandra's initial reaction was one of hostile challenge, declaring "we'll see about that."

USPS New Brunswick Annex 2015, under Sandra, was run like the Wild West. It was always crazy, disorganized, the chain of command fragile. Nobody would know their schedule until the last second; employees had to call in to work the morning of just to find out if they were working that day. Employees would then show up at irregular times. Every day, an employee would be subject to a different supervisor, which in this case would be Bernadette Cowherd ("Bernadette"), Jimmy ("Jimmy") Tee, Jackson Zhao, Muhammed Kabir, and if any of those subordinates would call out or be on vacation, Sandra—which only enhanced the chaos. You are called in to "case a route" (getting all the mail in order according to address, taking up to 2 hours), and then sent to deliver a route that someone else had (likely inaccurately) cased. An employee could be given a route without the requisite

key access to deliver selected mail; when that call is made to a supervisor for predictable assistance, there would be a different supervisor answering the call than the one who ordered the route. Supervisors would "break up" routes, a "pivot," or piece of a route, to avoid having a more expensive hourly employee ("Regular"), doing the whole route at a higher rate for the company. Vehicle breakdowns mid-route were common, disrupting the delivery while requiring another employee be sent out to relieve the stranded employee. Upon return from a route, an employee could expect an unpredictable sudden instruction to go back out for another delivery, at the end of a full shift, to conduct a pivot. Not only did the employee not get permitted to know what was ever going on, but the supervisors did not either; while other annexes were given weekly schedules to maintain stability, the New Brunswick Annex with Sandra would give no schedule in advance to City Carrier Assistants ("CCA's") at all, as the supervisors were lazy and did not care. Negligent conduct was easily tolerated, conduct to cover up such activity simply ignored. A lot of times, the only people the Annex could get to hire were low lives, frequently caught throwing out mail; giving in fake doctors letters for excused absences with later discovery of being at the basketball court. Supervisors would conduct creepy stalking exercises to try to keep their employees in line on their route; following them at random times and places. **Employees calling out from work and/or returning tons of mail—with no repercussions—was a standard event.** Other employees would just be tasked with picking up the slack, like there was nothing wrong with ditching an assignment.

In spite of all this chaos, Petitioner always showed up for work every day (unheard of at the Annex)—even during states of emergency for inclement weather—when half the Annex would generally just call out as not coming in. He would rush through his routes as fast as he could, without even taking any of his breaks, simply shut up and got it all done, working like a beast. Every day, even with a pivot, Petitioner would still get his route done, and even help others when he was sent out to help them. When the USPS gave Petitioner a task, they were guaranteed that it would get done.

PETITIONER'S ORIGINAL PETITION                                                                    3

Religious accommodation for Petitioner was common with the job. He would even get rides home from various co-workers or supervisors to help ensure he made it home in time for Shabbat. He was given no problem taking off for religious holidays, and it was a good job that Petitioner highly valued with intent to make it his career.

This tide changed, though, when Sandra decided that she would no longer accommodate him. This began in March 2015. Supervisory pressure and negative sentiment began to mount. Bernadette, the most active Sandra puppet bearing down on him, would make up issues and enjoy embarrassing him in front of his peers. He would be selectively sent on wild goose chases with only pretense of legitimacy, sometimes even required to drive his own vehicle at his own expense on these fools errands, rather than a company vehicle--as would be standard on work-related missions. Any attempt by Petitioner to stand up for himself and ask for standard objective treatment was greeted with greater hostility, even outright yelling or simply stalling him with his efforts at his expense. Other Regular employees would be encouraged to publicly embarrass him as well. This downward spiral of management hostility became fully tangible with the May 24-25, 2015 ("Shavuot") holiday, when Sandra and her cadre of puppet supervisors refused to acknowledge the regular verbal notice Petitioner would provide concerning the upcoming holiday and intended absence, referred to throughout this Response as malicious obliviousness. They would just blow him off, refusing to engage in the topic, and later try to deny it ever happened.

With Shavuot, Sandra was ready to create her first official act of religious harassment. With that malicious obliviousness and even yelling as part of it, she then denied ever knowing about the holiday when Petitioner became aware of this charade and put full force into telling Sandra about the upcoming absence to the point of argument. She simply still arbitrarily demanded Petitioner's attendance regardless of a light work weekend when Petitioner's own coworkers did not have to work. Evidently, with her incompetence in management and workplace of chaos, she never provided her supervisors

PETITIONER'S ORIGINAL PETITION                                                                                                  4

with the calendar Petitioner gave her, and probably did not care as she was already bent on this malicious conduct. When Petitioner did not attend work on Shavuot as she full well knew to expect, her stage/trap was set, and she could claim him as having a record of "delinquency," "walking off the job," and a host of other disparaging accusations. Thus began Sandra's crusade to force Petitioner out of his job by whatever means necessary.

Next came an official seven day suspension ("Suspension"). Because Petitioner knew what a sham this was and did not want to lose his chance to clear his record in a job that he highly valued, he engaged in the USPS Grievance process. Unfortunately, and little did Petitioner realize at the time, but Sandra's influence extended deeply into this process, and it was rigged from the start, concluding that Suspension was for "just cause." Also, once this harassment had become fully apparent, Petitioner had to try and do every additional action in his power to attempt to save his job: Sandra was putting up a charade of malicious obliviousness with regard to what "notice" she had received from Petitioner as to his Jewish holidays, so he then went out of his way--on his own initiative--and presented Sandra with a letter from his rabbi, further detailing when the Jewish holidays were that he needed to be off work.

Sandra planned her next attack for the next Jewish holiday, July 26th, 2015 ("Tish B'Av"). Once again, on replay, and with the further letter as additional notice, Petitioner notified all of his supervisors of the upcoming holiday. They were initially accepting of this announced time off as it was not exactly their crusade, but Sandra then circulated the word—even to the point of whispering into Gary's ear while Petitioner was meeting with him—and ordering Gary that Petitioner was to work on Tish B'Av, to which order Gary then instantly changed his story and referred the order for Petitioner to work that day. This order was so last minute, the work logs for Tish B'Av had already been set—without Petitioner on them—and Jimmy had to roughly scribble out other names and put Petitioner's name on the work log. What Sandra was not expecting, was that Petitioner did attend work that day in spite of it being a fast day with a religion-based excused absence. This event, therefore, was not brought up in Defendant's

EEOC Motion for Summary Judgment, as it could not claim that Petitioner had been "derelict in duty" when Petitioner actually did attend work in spite of the discrimination.

Sandra planned her next attack for Shabbat, September 11, 2015 ("Sept 11"). Petitioner had an imminent promotion to Regular coming up, Sandra was quite finished with accommodating Petitioner for Shabbat, and did not want this situation with Petitioner lasting with Petitioner having elevated status as Regular besides. She struck. Once again, on replay, Petitioner gave Jimmy notice the night before, on Thursday, that he had to leave early for Shabbat the next day on Friday, which obviously—after nearly a year of Shabbat accommodation—Defendant had to know. Jimmy merely blew him off, refusing to acknowledge this notice. Upon entering work the next day, Petitioner once again informed Jimmy that he could not do a full route. Jimmy threw false promises at him, assuring him that the route could be adjusted later in the day if needed, if Petitioner merely called in to express this need to Jimmy. This was a staged set up. When, predictably, Petitioner could not possibly finish a full day's route with his necessary half day schedule for Shabbat accommodation, he called in to Jimmy as previously instructed, only to hear that "Sandra told me to say that you are ordered to finish your route." Petitioner could not violate Shabbat to accommodate Sandra's arbitrary malice, so he was forced to return without fully delivering all the mail. Sandra's set up worked. There was so much mail that Petitioner was assigned to deliver that day as part of the set up, that it took two other employees working overtime for three hours just to get it all delivered—obviously impossible for Petitioner to have accomplished.

Next came a PDI on September 18, 2015 with Jimmy, based on returning the mail on Sept 11, whereby Petitioner was notified that he was not to have Shabbat accommodation any longer as "violating the contract"—by default making it impossible for Petitioner to work at USPS.

This was followed, around a week later on September 25, 2015, with a termination of Petitioner's USPS job, sent by mail ("Termination #1"). This Termination #1 totally went against the grain of routine practice at USPS, as it conflicted with a Letter of Reinstatement of Appointment

("Appointment") sent out around the same time. A termination has a 30-day period of review before taking effect. This Appointment made routine return to work obligatory, so Petitioner, still desiring to do whatever he could to see if maybe the letter had been sent in error and maybe he still had a shot of holding on to his desired USPS career, returned to work after his scheduled routine break in service on October 4, 2015, reporting to Bernadette. She firmly repeated the message of his firing in the most embarrassing manner possible in front of Petitioner's peers, ordering return of his badge, creating a second firing ("Termination #2"). So intent was Defendant to make sure that Termination #1 was to take effect, it actually spent hours on October 4, 2015 filing all the paperwork for unemployment, ensuring that Petitioner's status would be as separated from its workforce. But Defendant then wanted to cover its tracks and create another termination clear of this thicket of illegal misconduct. Thus, it staged a "Rescission" of Termination #1, denied Termination #2, created a period of AWOL to better effect blaming Petitioner, staged another "grievance process" and "investigation," and then issued its final cover of another termination on January 14, 2016 ("Termination #3").

But Defendant was not done yet. It still had to interfere with the Discovery process, ensuring that Petitioner could not gather evidence under its exclusive auspices.

And so Defendant brought an EEOC Motion for Summary Judgment, based on the thin argument that Petitioner's account of events is generally "wholly inadmissible," "speculation," "inflammatory," and a host of other pejoratives. Defendant likes to rely on generally having exclusive access to evidence of the case, preventing Petitioner from accessing the same; Defendant is willing to violate the rules in order to bury Petitioner's side of the story from ever seeing the light of day. Defendant relies on "tradition," its own speculations as though presumed true, to make its case. Defendant also likes to claim, thinking itself most clever, that none of its agents ever referred to religion as part of their harassment, and so this could not have been "religious" discrimination. Counter-intuitive, there, as whether or not express mention was made concerning religion, misconduct

must have happened by default in order for Defendant to claim that harassment was pulled off without reference to religion. Further, all of the misconduct was oriented toward Petitioner's Jewish observances, certainly then making the actions speak louder than words. Defendant also tries to portray itself as a saint, having accommodated Petitioner just so much up to the point of termination. What Defendant thereby leaves out is that such accommodation was a basic legal requirement, not worthy of boasting about, and even one instance of lack of accommodation, particularly so maliciously designed and implemented, was illegal. But, none of these Defendant arguments are based in law, and no matter how much Defendant wants to bury its illegal misconduct, America is based on a system of laws that permit religious protection from just the type of religious harassment and discrimination that Defendant engaged in.

### III. Statement of Facts, Exhibit DD

1. Petitioner started work at USPS on October 6, 2014 for Orientation.

2. Petitioner started work at the USPS New Brunswick Annex the week of October 27, 2014.

3. Immediately upon his arrival to work under Sandra, Petitioner presented a 16 month Jewish calendar covering 2014-2015, with accompanying detailed oral explanation.

4. Sandra's initial reaction to this declaration of religious observance was one of hostile challenge, declaring "we'll see about that."

5. Sandra initially accommodated Petitioner, even ordering his initial assigned mentor, Tim, to drop him off for Shabbat—in the USPS LLV vehicle—by 3 pm to make it home in time.

6. Petitioner was a workhorse, often waiving his breaks and just getting his work done.

7. The standard procedure for providing notice or instructions was to do so verbally.

8. Sandra altered her accommodating approach on March 10, 2015, when, after Petitioner finished his route, Bernadette called him over for a surprise attendance review. This was deliberately conducted publicly, in front of his fellow CCA's, rather than privately in an office.

PETITIONER'S ORIGINAL PETITION                                    8

9.  On April 7, 2015, Sandra sent Petitioner on a frivolous mission to the neighboring annex, Kendall Park, where the local Postmaster was not even notified to be expecting him.

10. The Kendall Park goose chase was targeted, as seniority dictated that CCA's with lesser experience be sent on such an assignment.

11. On the evening of April 7, 2015, Bernadette called Petitioner to notify him that he would yet again be sent to Kendall Park. When Petitioner demanded an explanation, the phone was passed to Sandra, who issued an ultimate of either "report to Kendall Park or get fired." This order was then sent by SMS.

12. Sandra never entered Petitioner's hours worked for Kendall Park and Highbridge, deliberately delaying his payment for that work.

13. On April 14, 2015, the targeting began in earnest. Petitioner was sent to Highbridge, an hour away, in contrast to any other employee of his standing where no one was ever sent there. Standard start time for work was 9:30 am or even 10:30 am, but he was ordered to show up by 7:30 am sharp, conflicting with his sacred daily prayer routine.

14. Internal office hostility toward Petitioner became apparent on April 23, 2015. Petitioner reported for work at 10 am to Bernadette, and mid-conversation with her, a Regular, Sally [unknown], walks up and starts senselessly verbally assaulting him out of nowhere, screaming and yelling and hollering continuously: "Just quit! You are not wanted here! You suck! We don't want you here!" Bernadette did nothing, no consequence for this outburst to hold Sally accountable, making it endorsed.

15. On April 24, 2015, payment systems under Sandra's control began being sabotaged to Petitioner's detriment. The Kendall Park and Highbridge work hours, proof of which provided by these respective annexes, was not entered into the system when presented to Sandra. Bernadette later texted Petitioner that they would take care of this.

16. This escalated to April 27, 2015 at 10:05 am, when Petitioner noticed that his paycheck was still missing the payment from work done at Kendall Park and Highbridge. When Petitioner confronted Sandra about this, a brief exchange took place with Sandra brushing him off, denying involvement, and finally just telling him to "get out of my office."

17. From this time, through to Shavuot, Petitioner would verbally notify his supervisors 3-4 times a week concerning his upcoming holiday of Shavuot, but they would just blow him off, not accepting this notice.

18. On May 20, 2015, as Shavuot was approaching, Petitioner more emphatically tried to provide this notice. The response was Bernadette texting him that when he got off work, he was to call Sandra. On the call, Sandra declared that she did not recognize his holidays so May 25th attendance was mandatory, there would be consequences if he didn't attend, and she had no interest to hear anymore about his holidays.

19. On Shavuot, there was radio silence from management, as they knew he would not be attending.

20. On the following work day, May 26, 2015, Petitioner arrives to work at 10 am, per standard. Once he's assigned his route by Bernadette, she ambushes him with a pen and paper, trying to casually induce him into signing an acknowledgment that he deliberately and impermissibly missed work over Shavuot. Jackson also observed. When Petitioner refused to sign under the pressure, Bernadette acted like this was a transgression and walked away shaking her head.

21. Bernadette shortly thereafter provided a copy of this attempted "confession." Sandra appeared a few minutes later, stating that he had refused to attend work and "don't have an attitude toward me."

22. On June 4, 2015, Petitioner was specifically targeted. He arrived at 10 am, and was only then notified by the new supervisor, Muhammed, that he was to case a route, preparation for which CCA's would arrive 2-3 hours early to do. None of his peers had yet even been given such an

assignment. To add insult to injury, the supervisor makes up a reason for a "Letter of Warning" for curbing tires, an excessive response given that mere verbal warnings are given for much worse conduct.

23. On June 5, 2015, Petitioner was called in for a Pre-Disciplinary Interview ("PDI") with Jackson for the Shavuot absence, the day after receiving the other Letter of Warning—a sign of design. Petitioner wasn't allowed to have his regular Shop Steward accompany him, but was forced to have an unfamiliar assigned one, Gene. Upon discussion of the absence, Jackson admits that he knows why Petitioner was absent over Shavuot, but that Sandra is speaking through him, accusing Petitioner.

24. Gary Lange ("Gary"), the Union Representative, since the Shavuot incident, had been and continued to blow Petitioner off, assuring him that this was all a misunderstanding, actually urging Petitioner not to file an EEO complaint.

25. On June 16, 2015, Petitioner was suspended for 7 days. Bernadette claimed that she had paperwork for him and to wait for her to return, but never returned.

26. On June 21, 2015, Awisi Benyarko ("Awisi"), a close CCA colleague to Petitioner, was able to call out—no issue. A sign of disparate treatment from the mounting managerial pressure on Petitioner.

27. On June 24, 2015, Petitioner was called into Jimmy's office to hear from him how, because of confusion over a scan, Petitioner supposedly didn't care about his job; creating the running theme that because Petitioner couldn't work on Shabbat, he had an attitude and didn't care about the job.

28. On June 26, 2015, Petitioner was once again assigned to East Brunswick, while still not having been paid for the previous runs and with such an assignment once again violating the rules of seniority. Only after getting Gary to intervene with Sandra was the assignment reversed. This

attempt at another goose chase was just to try to get Petitioner to quit.

29. Petitioner was working 6 days a week, with his only day off being Shabbat. Sandra would target Petitioner's schedule, only permitting doctors appointments for those Saturdays in an exercise of malice.

30. On July 5, 2015, Awisi saw that he was assigned to East Brunswick. He simply decided that he wanted to transfer assignments, requested this of Bernadette, and she simply erased that assignment and substituted it with New Brunswick instead. Disparate treatment.

31. On July 15, 2015, Petitioner arrives to work at 9:30 am, no route having been prepared. Other CCA's have their route prepared and ready to go by Regulars, per Sandra and Bernadette's orders, including Awisi, but Petitioner got shut out. Disparate treatment.

32. On July 22, 2015, at 10:07 am, while Petitioner was talking to Gary, Sandra comes over, whispers in Gary's ear that Petitioner needs to work that Sunday, July 26, 2015 ("Tish B'Av"). Jimmy had previously stated that an absence on that day, a fast day, was no problem.

33. On Tish B'Av, when Petitioner arrived, no route was prepared for him. Sandra had actually informed Jimmy that Petitioner was not coming in but was supposed to come in, along with expressly ordering Gary that Petitioner was to come in. Sandra had anticipated being able to set up Petitioner for discipline when he was thought to be absent, but Petitioner's unexpected attendance foiled that plot.

34. On July 27, 2015, Jackson expresses to Petitioner how he does not understand how Petitioner could get a hold down on route 52 if Petitioner does not work on Saturday. Targeted discrimination.

35. On Friday, July 31, 2015, Sandra targets Petitioner concerning his Friday Shabbat observance. She deliberately loaded Petitioner up with excessive work, too much to be done in a half day: full route plus a two hour pivot. The Annex was not short of staff that day. Petitioner still tries to

do the assignment to the best of his ability, but predictably has to call in to the supervisors for someone else to relieve him. Bernadette answers, blows him off. Another call back in, Jackson answers, speaking from Sandra under the charade of why he has to come back in. When Petitioner presses his point, Jackson admits that he knows the situation, but that it's Sandra asking. **Jackson asked Petitioner if he could just work on Shabbat that one time.** Gary was notified to this incident.

36. On August 9, 2015, Catherine Cardenes ("Catherine") calls out for a school exam. She's always accommodated for Sundays, as to not be accommodated is just arbitrary. Petitioner and five other Regulars are assigned to split up her route instead. Other employees get accommodations easily for far less reasons.

37. On August 23, 2015, Shay, a co-worker, does not show up for work, even though on the schedule. He had been complaining about having to work on Sundays, so just decided not to.

38. On September 3, 2015, Sandra targets Petitioner's Shabbat observance again. He notifies her of his need to finish his route by 5 pm. She aggressively contests this, declaring that he should only leave by 8 pm, and not to bring back any mail. Petitioner asks her just to not give me excess mail that he won't be able to do by 5 pm. **She straight screams at him: "DON'T TELL ME WHAT TO DO!"** This, publicly in front of other employees. Petitioner was working at the Annex the whole year, but now she's creating issues by acting like she doesn't know about his religious practice for Friday evenings. Even her own supervisors, Jimmy and Frank, had driven Petitioner home for Friday evenings.

39. On September 4, 2015, Shanay Williams brings back carriage mail, no issue. A sign of disparate treatment.

40. On September 5, 2015, Edward Medina ("Eddie"), a fellow CCA of the same or lesser rank, calls out from work, and for the next day as well. He merely gets called into the office for

PETITIONER'S ORIGINAL PETITION                                                                 13

verbal discipline, nothing more. A sign of disparate treatment.

41. On September 6, 2015, 3 people called out, no discipline issued. Petitioner and others had to fill in, delivering extra packages. A sign of disparate treatment.

42. On September 7, 2015, Shay Williams didn't show up, Petitioner and others had to fill in delivering packages. No suspension or other discipline. A sign of disparate treatment and Petitioner being targeted.

43. On September 8, 2015, Patrick, route 447, brought back first class mail parcels, more than one tray of them. No firing, no suspension, no other discipline. A sign of disparate treatment and Petitioner being targeted. A double standard.

    1. Eddie calls out as, being the day after Labor Day, the workload was heavier and he wanted to avoid it. No discipline.

44. On September 11, 2015, the final set up took place. The night before, Petitioner approached Jimmy to notify of needing to be off the clock early the next day. Jimmy refused to acknowledge this. The next morning, Jimmy gives Petitioner an excessively full route, but falsely promises that adjustments to the route can be made if he only calls in to ask. When Petitioner inevitably calls, Jimmy plays coy, refuses to acknowledge the need for return to the office, sounding staged. He suddenly claims that there's no one to relieve Petitioner from the route. With no choice but to return or violate the Shabbat, Petitioner returns with the mail. Sandra happily greets him upon return, which she never does—a sign of a planned encounter. She cheerfully tells him that if he returns the mail, he's abandoning his job, proudly guaranteeing that he will be fired. Petitioner has no time by that point for games, as he has to make it back home in time for Shabbat. He leaves the office.

45. On September 13, 2015, Sandra tries to set up Petitioner again. She had told him not to come in until a PDI was scheduled. Petitioner, as per his job, showed up anyway, to find that he had still

been on the roster; if he had strictly followed her order, he would've been accused of not

attending work, and he would've been fired.

46. On September 25, 2015, Petitioner was sent his Termination #1, with further indication of this

in a Notification of Personnel Action Effective September 28, 2015.

47. On October 4, 2015, Termination #1 was confirmed with Bernadette's oral firing. Termination

#2.

48. On November 28, 2015, Petitioner was sent Notification Of Personnel Action for a promotion.

Designed firing before promotion = Failure to Promote = Termination.

49. Petitioner was later fired as AWOL on January 14, 2016. Termination #3.

### IV. Statement of the Claims

The claims in this case are: 1) Hostile Work Environment, 2) Religion Discrimination, 3)

Retaliation, 4) Failure to Accommodate, 5) Constructive Discharge

### A. Religion Discrimination & Failure to Promote

*Noel v. Boeing Co.,* 622 F.3d 266, 270, 2010 WL 3817090 (3rd Cir. 2010), citing Title VII Civil Rights

Act of 1964, 42 U.S.C. Section 2000e-2(a)(1)(-2) sets out the standard for Religion Discrimination:

Title VII makes it unlawful for an employer "to...discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment...or...to limit...or classify

his employees...in any way which would deprive...any individual of employment opportunities or

otherwise adversely affect his status as an employee, because of such individual's...religion.

Section III: Statement of Facts:

#2: ("Petitioner started work at the USPS New Brunswick Annex the week of October

27, 2014.")

#3: ("presented via a calendar his status as Jewish with intended religious time off

work")

#4): ("Sandra's initial reaction to this declaration of religious observance was one of hostile challenge, declaring **"we'll see about that."**")

#18) ("On 5-20-15, Bernadette instructs Petitioner to call Sandra, where Sandra declares: **she did not recognize his holidays,** so 5-25-15 Shavuot attendance was mandatory, there would be consequences if he didn't attend, and **"no interest to hear anymore about holidays"**)

#32) ("On 7-22-15, Sandra intervenes in a conversation with Gary to ensure ordering Petitioner **to work on the fast day of Tish B'Av**");

#35) ("On 7-31-15, for the first of three events of a pattern repeated in #38 & #44, Sandra deliberately loads Petitioner with an excessive work load during his known half day on a Friday, with Jackson then asking if Petitioner **could just work on Shabbat that one time**; #38) On 9-03-15, Sandra declares that Petitioner **should only be leaving work by 8 pm,** contrary to his expressed need to leave by 5 pm for Shabbat observance")

#38) ("On September 3, 2015, Sandra targets Petitioner's Shabbat observance again. He notifies her of his need to finish his route by 5 pm. She aggressively contests this, declaring that he should only leave by 8 pm, and not to bring back any mail. Petitioner asks her just to not give me excess mail that he won't be able to do by 5 pm. **She straight screams at him: "DON'T TELL ME WHAT TO DO!"** This, publicly in front of other employees. Petitioner was working at the Annex the whole year, but now she's creating issues by acting like she doesn't know about his religious practice for Friday evenings. Even her own supervisors, Jimmy and Frank, had driven Petitioner home for Friday evenings.")

#44) ("On September 11, 2015, the final set up took place. The night before, Petitioner approached Jimmy to notify of needing to be off the clock early the next day. Jimmy refused to acknowledge this. The next morning, Jimmy gives Petitioner an excessively full route, but falsely promises that adjustments to the route can be made if he only calls in to ask. When Petitioner inevitably

PETITIONER'S ORIGINAL PETITION                                                                 16

calls, **Jimmy plays coy, refuses to acknowledge the need for return to the office, sounding staged.** He suddenly claims that there's no one to relieve Petitioner from the route. **With no choice but to return or violate the Shabbat,** Petitioner returns with the mail. Sandra happily greets him upon return, which she never does—a sign of a planned encounter. She cheerfully tells him that if he returns the mail, he's abandoning his job, proudly guaranteeing that he will be fired. Petitioner has no time by that point for games, as he has to make it back home in time for Shabbat. He leaves the office.")

#46) ("On September 25, 2015, Petitioner was sent his Termination #1, with further indication of this in a Notification of Personnel Action Effective September 28, 2015.")

#48: ("On November 28, 2015, Petitioner was sent Notification Of Personnel Action for a promotion. Designed firing before promotion = Failure to Promote = Termination.")

These facts establish that the pervasive harassment and ultimate termination that Petitioner faced were all based on his protected religious observances, and this was thus Religion Discrimination that included a failure to promote.

### B. Disparate Treatment/Failure to Accommodate

*Abramson v. William Paterson College of NJ,* 260 F.3d 265, 281 (3rd Cir. 2001) sets out the standard for a claim of failure to accommodate:

Employees may assert "disparate treatment" and "failure to accommodate" by demonstrating: 1) he is a member of a protected class, 2) he was qualified and rejected for the position sought, and 3) nonmembers of the protected class were treated more favorably.

Here, the first element, (member of a protected class), is met with Fact:

#3: ("presented via a calendar his status as Jewish with intended religious time off work").

#4): ("Sandra's initial reaction to this declaration of religious observance was one of hostile

challenge, declaring **"we'll see about that."**")

The second element (he was qualified and rejected for the position sought) is met with Facts:

 #1: ("Petitioner started work at USPS on October 6, 2014 for Orientation.")

#2: ("Petitioner started work at the USPS New Brunswick Annex the week of October 27, 2014.")

 #46: ("On September 25, 2015, Petitioner was sent his Termination #1, with further indication of this in a Notification of Personnel Action Effective September 28, 2015.")

The third element, (nonmembers of the protected class were treated more favorably) is met with the following Facts, among others:

#8) ("Sandra altered her accommodating approach on March 10, 2015, when, after Petitioner finished his route, Bernadette called him over for a surprise attendance review. This was deliberately conducted publicly, in front of his fellow CCA's, rather than privately in an office")--public humiliation for a surprise attendance review—this is disparate treatment ;

#9 ("On April 7, 2015, Sandra sent Petitioner on a frivolous mission to the neighboring annex, Kendall Park, where the local Postmaster was not even notified to be expecting him.")--this is disparate treatment;

#11) ("On the evening of April 7, 2015, Bernadette called Petitioner to notify him that he would yet again be sent to Kendall Park. When Petitioner demanded an explanation, the phone was passed to Sandra, who issued an ultimate of either "report to Kendall Park or get fired." This order was then sent by SMS."): as an additional re-assignment to Kendall Park—disparate treatment;

#14) ("Internal office hostility toward Petitioner became apparent on April 23, 2015. Petitioner reported for work at 10 am to Bernadette, and mid-conversation with her, a Regular, Sally [unknown],

walks up and starts senselessly verbally assaulting him out of nowhere, screaming and yelling and hollering continuously: "Just quit! You are not wanted here! You suck! We don't want you here!" Bernadette did nothing, no consequence for this outburst to hold Sally accountable, making it endorsed."): this is openly permitted hostility and harassment toward Petitioner in the workplace—disparate treatment;

#17) ("From this time, through to Shavuot, Petitioner would verbally notify his supervisors 3-4 times a week concerning his upcoming holiday of Shavuot, but they would just blow him off, not accepting this notice."): Supervisors refused to accept the frequent advance notice provided by Petitioner as to his intended Shavuot absence—direct failure to accommodate;

#18) ("On May 20, 2015, as Shavuot was approaching, Petitioner more emphatically tried to provide this notice. The response was Bernadette texting him that when he got off work, he was to call Sandra. On the call, Sandra declared that she did not recognize his holidays so May 25th attendance was mandatory, there would be consequences if he didn't attend, and she had no interest to hear anymore about his holidays."): Sandra declares that she does not recognize Petitioner's holidays, thereby making Shavuot attendance mandatory—direct failure to accommodate;

#22) ("On June 4, 2015, Petitioner was specifically targeted. He arrived at 10 am, and was only then notified by the new supervisor, Muhammed, that he was to case a route, preparation for which CCA's would arrive 2-3 hours early to do. None of his peers had yet even been given such an assignment. To add insult to injury, the supervisor makes up a reason for a "Letter of Warning" for curbing tires, an excessive response given that mere verbal warnings are given for much worse conduct."): Petitioner was assigned to case a route, which assignment none of his peers had been given—disparate treatment;

#25) ("On June 16, 2015, Petitioner was suspended for 7 days. Bernadette claimed that she had paperwork for him and to wait for her to return, but never returned."): Petitioner was

suspended for 7 days, on 6-16-15, as part of the failure to accommodate Shavuot absence;

#26) ("On June 21, 2015, Awisi Benyarko ("Awisi"), a close CCA colleague to Petitioner, was able to call out—no issue. A sign of disparate treatment from the mounting managerial pressure on Petitioner."): Petitioner's colleague was permitted to call out of work with no issue—disparate treatment;

#29) ("Petitioner was working 6 days a week, with his only day off being Shabbat. Sandra would target Petitioner's schedule, only permitting doctors appointments for those Saturdays in an exercise of malice."): Sandra only permitted doctor visits absences for Shabbat (for which observance a visit to the doctor is not possible, thereby maliciously prohibiting Petitioner from doctor visits)--failure to accommodate;

#30) ("On July 5, 2015, Awisi saw that he was assigned to East Brunswick. He simply decided that he wanted to transfer assignments, requested this of Bernadette, and she simply erased that assignment and substituted it with New Brunswick instead. Disparate treatment."): On 7-05-15, co-worker Awisi is permitted to merely request an assignment transfer and it's easily granted—disparate treatment;

#32) ("On July 22, 2015, at 10:07 am, while Petitioner was talking to Gary, Sandra comes over, whispers in Gary's ear that Petitioner needs to work that Sunday, July 26, 2015 ("Tish B'Av"). Jimmy had previously stated that an absence on that day, a fast day, was no problem."): On 7-22-15, Sandra deliberately overrides previously-granted permission to be absent over Tish B'Av—failure to accommodate;

#33) ("On Tish B'Av, when Petitioner arrived, no route was prepared for him. Sandra had actually informed Jimmy that Petitioner was not coming in but was supposed to come in, along with expressly ordering Gary that Petitioner was to come in. Sandra had anticipated being able to set up Petitioner for discipline when he was thought to be absent, but Petitioner's unexpected attendance

foiled that plot."): Petitioner obliges the new order to be present on Tish B'Av, but with no route prepared for him upon arriving, the order for attendance was clearly a mere pretext to stage another disciplinary action against him for anticipated absence—failure to accommodate;

#35) ("On Friday, July 31, 2015, Sandra targets Petitioner concerning his Friday Shabbat observance. She deliberately loaded Petitioner up with excessive work, too much to be done in a half day: full route plus a two hour pivot. The Annex was not short of staff that day. Petitioner still tries to do the assignment to the best of his ability, but predictably has to call in to the supervisors for someone else to relieve him. Bernadette answers, blows him off. Another call back in, Jackson answers, speaking from Sandra under the charade of why he has to come back in. When Petitioner presses his point, Jackson admits that he knows the situation, but that it's Sandra asking. **Jackson asked Petitioner if he could just work on Shabbat that one time.** Gary was notified to this incident."): On 7-31-15, for the first of three events of a pattern repeated in #38 & #44, Sandra deliberately loads Petitioner with an excessive work load during his known half day on a Friday—failure to accommodate;

#36) ("On August 9, 2015, Catherine Cardenes ("Catherine") calls out for a school exam. She's always accommodated for Sundays, as to not be accommodated is just arbitrary. Petitioner and five other Regulars are assigned to split up her route instead. Other employees get accommodations easily for far less reasons."): On 8-09-15, Catherine is accommodated per usual for a Sunday, and other Regulars are assigned to split up her route instead with no issues—disparate treatment;

#37) ("On August 23, 2015, Shay, a co-worker, does not show up for work, even though on the schedule. He had been complaining about having to work on Sundays, so just decided not to. "): On 8-23-15, Shay, a co-worker, does not show up for work, and receives no repercussions—disparate treatment;

#38) ("On September 3, 2015, Sandra targets Petitioner's Shabbat observance again. He notifies her of his need to finish his route by 5 pm. She aggressively contests this, declaring that he

should only leave by 8 pm, and not to bring back any mail. Petitioner asks her just to not give me excess mail that he won't be able to do by 5 pm. **She straight screams at him: "DON'T TELL ME WHAT TO DO!"** This, publicly in front of other employees. Petitioner was working at the Annex the whole year, but now she's creating issues by acting like she doesn't know about his religious practice for Friday evenings. Even her own supervisors, Jimmy and Frank, had driven Petitioner home for Friday evenings."): On 9-03-15, Sandra again loads Petitioner with an excessive workload on a Friday, demanding that he work until at least 8 pm—failure to accommodate;

#39) ("On 9-04-15, Shanay Williams brings back mail, with no issue"): disparate treatment;

#40) ("On 9-05-15, Eddie calls out from work for two days, receiving only verbal discipline"):—disparate treatment;

#41) ("On 9-06-15, 3 people called out, no discipline issued, and Petitioner and others had to fill in")—disparate treatment;

#42) ("On 9-0715, Shay Williams didn't show up and received no suspension or other discipline, with Petitioner and others required to fill in")—disparate treatment;

#43) ("On 9-08-15, [1] Patrick brought back multiple trays of mail, facing no firing, no suspension, no other discipline—disparate treatment, and [2] Eddie calls out to avoid a workload, with no discipline")—disparate treatment;

#44) ("On 9-11-15, the final of 3 set-ups whereby Sandra once again excessively loads up Petitioners workload to make it impossible to finish within a half day, then verbally guarantees impending firing when Petitioner is forced to predictably return early with some of that excessive workload")—failure to accommodate;

Here, Petitioner was clearly targeted for much worse treatment than his peers, thus establishing

disparate treatment and failure to accommodate.

### C. Hostile Work Environment

*Abramson v. William Paterson College of New Jersey,* at 276-277, sets out the standard for a Hostile

Work Environment claim:

To make out a prima facie case for religiously hostile work environment under Title VII, a
plaintiff must demonstrate five elements: 1) the employee suffered intentional discrimination because
of religion; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally
affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person of the same
religion in that position; and 5) the existence of respondeat superior liability.

Here, these elements are met with the following Facts:

Section III Statement of Facts:

1) (the employee suffered intentional discrimination because of religion):

#3) ("Immediately upon his arrival to work under Sandra, Petitioner presented a 16
month Jewish calendar covering 2014-2015, with accompanying detailed oral explanation."): Petitioner
presented via a calendar his status as Jewish with intended religious time off work;

#4) ("Sandra's initial reaction to this declaration of religious observance was one of
hostile challenge, declaring **"we'll see about that."**")

#5) ("Sandra initially accommodated Petitioner, even ordering his initial assigned
mentor, Tim, to drop him off for Shabbat—in the USPS LLV vehicle—by 3 pm to make it home in
time."): Sandra initially accommodates Petitioner, ordering that his mentor drop him off from work as
early as 3 pm on a Friday; [(March 10th) #8 – (April 14th)]

#18) ("On May 20, 2015, as Shavuot was approaching, Petitioner more emphatically

tried to provide this notice. The response was Bernadette texting him that when he got off work, he was to call Sandra. On the call, **Sandra declared that she did not recognize his holidays so May 25th attendance was mandatory, there would be consequences if he didn't attend, and she had no interest to hear anymore about his holidays.**")

#20) ("On the following work day, May 26, 2015, Petitioner arrives to work at 10 am, per standard. Once he's assigned his route by Bernadette, she ambushes him with a pen and paper, **trying to casually induce him into signing an acknowledgment that he deliberately and impermissibly missed work over Shavuot.** Jackson also observed. When Petitioner refused to sign under the pressure, Bernadette acted like this was a transgression and walked away shaking her head.")

#29) ("Petitioner was working 6 days a week, with his only day off being Shabbat. **Sandra would target Petitioner's schedule, only permitting doctors appointments for those Saturdays in an exercise of malice.**")

#32) ("On July 22, 2015, at 10:07 am, while Petitioner was talking to Gary, **Sandra comes over, whispers in Gary's ear that Petitioner needs to work that Sunday, July 26, 2015 ("Tish B'Av").** Jimmy had previously stated that an absence on that day, a fast day, was no problem.")

#34) ("On July 27, 2015, Jackson expresses to Petitioner how he does not understand how Petitioner could get a hold down on route 52 if Petitioner does not work on Saturday. Targeted discrimination.")

#35) ("On Friday, July 31, 2015, Sandra targets Petitioner concerning his Friday Shabbat observance. She deliberately loaded Petitioner up with excessive work, too much to be done in a half day: full route plus a two hour pivot. The Annex was not short of staff that day. Petitioner still tries to do the assignment to the best of his ability, but predictably has to call in to the supervisors for someone else to relieve him. Bernadette answers, blows him off. Another call back in, Jackson answers, speaking from Sandra under the charade of why he has to come back in. When Petitioner presses his point,

Jackson admits that he knows the situation, but that it's Sandra asking. **Jackson asked Petitioner if he could just work on Shabbat that one time.** Gary was notified to this incident.")

#38) ("On September 3, 2015, Sandra targets Petitioner's Shabbat observance again. He notifies her of his need to finish his route by 5 pm. She aggressively contests this, declaring that he should only leave by 8 pm, and not to bring back any mail. Petitioner asks her just to not give me excess mail that he won't be able to do by 5 pm. **She straight screams at him: "DON'T TELL ME WHAT TO DO!"** This, publicly in front of other employees. Petitioner was working at the Annex the whole year, but now she's creating issues by acting like she doesn't know about his religious practice for Friday evenings. Even her own supervisors, Jimmy and Frank, had driven Petitioner home for Friday evenings.")

    2) (the discrimination was pervasive and regular):

        All facts as applied to the first element also apply to this second element.

        #8) ("Sandra altered her accommodating approach on March 10, 2015, when, after Petitioner finished his route, Bernadette called him over for a surprise attendance review. This was deliberately conducted publicly, in front of his fellow CCA's, rather than privately in an office.")

        #9) ("On April 7, 2015, Sandra sent Petitioner on a frivolous mission to the neighboring annex, Kendall Park, where the local Postmaster was not even notified to be expecting him.")

        #11) ("On the evening of April 7, 2015, Bernadette called Petitioner to notify him that he would yet again be sent to Kendall Park. When Petitioner demanded an explanation, the phone was passed to Sandra, who issued an ultimate of either "report to Kendall Park or get fired." This order was then sent by SMS.")

#12) ("Sandra never entered Petitioner's hours worked for Kendall Park and Highbridge, deliberately delaying his payment for that work.")

#13) ("On April 14, 2015, the targeting began in earnest. Petitioner was sent to Highbridge, an hour away, in contrast to any other employee of his standing where no one was ever sent there. Standard start time for work was 9:30 am or even 10:30 am, but he was ordered to show up by 7:30 am sharp, conflicting with his sacred daily prayer routine.")

#14) ("Internal office hostility toward Petitioner became apparent on April 23, 2015. Petitioner reported for work at 10 am to Bernadette, and mid-conversation with her, a Regular, Sally [unknown], **walks up and starts senselessly verbally assaulting him out of nowhere, screaming and yelling and hollering continuously: "Just quit! You are not wanted here! You suck! We don't want you here!" Bernadette did nothing, no consequence for this outburst to hold Sally accountable, making it endorsed.**")

#15) ("On April 24, 2015, payment systems under Sandra's control began being sabotaged to Petitioner's detriment. The Kendall Park and Highbridge work hours, proof of which provided by these respective annexes, was not entered into the system when presented to Sandra. Bernadette later texted Petitioner that they would take care of this.")

#16) ("This escalated to April 27, 2015 at 10:05 am, when Petitioner noticed that his paycheck was still missing the payment from work done at Kendall Park and Highbridge. When Petitioner confronted Sandra about this, a brief exchange took place with Sandra brushing him off, denying involvement, and finally just telling him to **"get out of my office."**")

#17) ("From this time, through to Shavuot, Petitioner would verbally notify his supervisors 3-4 times a week concerning his upcoming holiday of Shavuot, but they would just blow him off, not accepting this notice.")

#21) ("Bernadette shortly thereafter provided a copy of this attempted "confession."

Sandra appeared a few minutes later, stating that he had refused to attend work and **"don't have an attitude toward me."**")

#22) ("On June 4, 2015, Petitioner was specifically targeted. He arrived at 10 am, and was only then notified by the new supervisor, Muhammed, that he was to case a route, preparation for which CCA's would arrive 2-3 hours early to do. None of his peers had yet even been given such an assignment. To add insult to injury, the **supervisor makes up a reason for a "Letter of Warning" for curbing tires,** an excessive response given that mere verbal warnings are given for much worse conduct.")

#23) ("On June 5, 2015, Petitioner was called in for a Pre-Disciplinary Interview ("PDI") with Jackson for the Shavuot absence, the day after receiving the other Letter of Warning—a sign of design. Petitioner wasn't allowed to have his regular Shop Steward accompany him, but was forced to have an unfamiliar assigned one, Gene. Upon discussion of the absence, **Jackson admits that he knows why Petitioner was absent over Shavuot, but that Sandra is speaking through him, accusing Petitioner.**")

#24) ("Gary Lange ("Gary"), the Union Representative, since the Shavuot incident, had been and continued to blow Petitioner off, assuring him that this was all a misunderstanding, **actually urging Petitioner not to file an EEO complaint.**")

#25) ("On June 16, 2015, Petitioner was suspended for 7 days. Bernadette claimed that she had paperwork for him and to **wait for her to return, but never returned.**")

#27) ("On June 24, 2015, Petitioner was called into Jimmy's office to hear from him how, because of confusion over a scan, Petitioner **supposedly didn't care about his job**; creating the running theme that **because Petitioner couldn't work on Shabbat, he had an attitude and didn't care about the job.**")

#28) ("On June 26, 2015, Petitioner was once again assigned to East Brunswick, while

still not having been paid for the previous runs and with such an assignment once again violating the rules of seniority. Only after getting Gary to intervene with Sandra was the assignment reversed. **This attempt at another goose chase was just to try to get Petitioner to quit.**"

#31) ("On July 15, 2015, Petitioner arrives to work at 9:30 am, no route having been prepared. Other CCA's have their route prepared and ready to go by Regulars, per Sandra and Bernadette's orders, including Awisi, but Petitioner got shut out. Disparate treatment.")

#33) ("On Tish B'Av, when Petitioner arrived, no route was prepared for him. Sandra had actually informed Jimmy that Petitioner was not coming in but was supposed to come in, along with expressly ordering Gary that Petitioner was to come in. Sandra had anticipated being able to set up Petitioner for discipline when he was thought to be absent, but Petitioner's unexpected attendance foiled that plot.")

#44) ("On September 11, 2015, the final set up took place. The night before, Petitioner approached Jimmy to notify of needing to be off the clock early the next day. Jimmy refused to acknowledge this. The next morning, Jimmy gives Petitioner an excessively full route, but falsely promises that adjustments to the route can be made if he only calls in to ask. When Petitioner inevitably calls, Jimmy plays coy, refuses to acknowledge the need for return to the office, sounding staged. He suddenly claims that there's no one to relieve Petitioner from the route. With no choice but to return or violate the Shabbat, Petitioner returns with the mail. Sandra happily greets him upon return, which she never does—a sign of a planned encounter. **She cheerfully tells him that if he returns the mail, he's abandoning his job, proudly guaranteeing that he will be fired.** Petitioner has no time by that point for games, as he has to make it back home in time for Shabbat. He leaves the office.")

#45) ("On September 13, 2015, Sandra tries to set up Petitioner again. She had told him not to come in until a PDI was scheduled. Petitioner, as per his job, showed up anyway, to find that he had still been on the roster; if he had strictly followed her order, he would've been accused of not

PETITIONER'S ORIGINAL PETITION                                                                28

attending work, and he would've been fired.")

3) (the discrimination detrimentally affected the plaintiff):

Here, the Statements of Facts clearly shows that Sandra created an environment whereby it was impossible for Petitioner to do his job. Further, this pervasive harassment caused Petitioner to need a psychiatrist and physical therapy, and ultimately cost him his USPS job.

4) (the discrimination would detrimentally affect a reasonable person of the same religion in that position): Here, the Statement of Facts clearly shows that Sandra created an environment wherein no one practicing Judaism could have done the job. It was not possible to observe Jewish Holidays and Shabbat while being compelled to break those same holidays and observance.

5) (the existence of respondeat superior liability): Sandra and her cadre of supervisors all acted on behalf of the USPS and with authority regarding Petitioner's USPS job.

A prima facie claim for Hostile Work Environment is therefore established, with all elements met.

## D. Retaliation

*Abramson,* at 286, sets out the standard for a Retaliation claim:

A Retaliation claim requires: 1) the employee engaged in a protected employee activity, 2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity, and 3) a causal link exists between the employee's protected activity and the employer's

adverse action.

Section III Statement of Facts:

1)  (the employee engaged in a protected employee activity):

#2: ("Petitioner started work at the USPS New Brunswick Annex the week of October 27, 2014.")

2) (the employer took an adverse employment action after or contemporaneous with the employee's protected activity)

#46: ("On September 25, 2015, Petitioner was sent his Termination #1, with further indication of this in a Notification of Personnel Action Effective September 28, 2015.")

3) (a causal link exists between the employee's protected activity and the employer's adverse action.)

*See supra*, Section IV. C.

#4) ("Sandra's initial reaction to this declaration of religious observance was one of hostile challenge, **declaring "we'll see about that.""**)

#18) ("On 5-20-15, Bernadette instructs Petitioner to call Sandra, where Sandra declares: **she did not recognize his holidays,** so 5-25-15 Shavuot attendance was mandatory, there would be consequences if he didn't attend, and **"no interest to hear anymore about holidays"**)

#32) ("On 7-22-15, Sandra intervenes in a conversation with Gary to ensure ordering Petitioner **to work on the fast day of Tish B'Av**");

#35) ("#35) On 7-31-15, for the first of three events of a pattern repeated in #38 & #44,

PETITIONER'S ORIGINAL PETITION                                                                    30

Sandra deliberately loads Petitioner with an excessive work load during his known half day on a Friday, with Jackson then asking if Petitioner **could just work on Shabbat that one time**; #38) On 9-03-15, Sandra declares that Petitioner **should only be leaving work by 8 pm,** contrary to his expressed need to leave by 5 pm for Shabbat observance")

#38) ("On September 3, 2015, Sandra targets Petitioner's Shabbat observance again. He notifies her of his need to finish his route by 5 pm. She aggressively contests this, declaring that he should only leave by 8 pm, and not to bring back any mail. Petitioner asks her just to not give me excess mail that he won't be able to do by 5 pm. **She straight screams at him: "DON'T TELL ME WHAT TO DO!"** This, publicly in front of other employees. Petitioner was working at the Annex the whole year, but now she's creating issues by acting like she doesn't know about his religious practice for Friday evenings. Even her own supervisors, Jimmy and Frank, had driven Petitioner home for Friday evenings.")

#44) ("On September 11, 2015, the final set up took place. The night before, Petitioner approached Jimmy to notify of needing to be off the clock early the next day. Jimmy refused to acknowledge this. The next morning, Jimmy gives Petitioner an excessively full route, but falsely promises that adjustments to the route can be made if he only calls in to ask. When Petitioner inevitably calls, **Jimmy plays coy, refuses to acknowledge the need for return to the office, sounding staged.** He suddenly claims that there's no one to relieve Petitioner from the route. **With no choice but to return or violate the Shabbat,** Petitioner returns with the mail. Sandra happily greets him upon return, which she never does—a sign of a planned encounter. She cheerfully tells him that if he returns the mail, he's abandoning his job, proudly guaranteeing that he will be fired. Petitioner has no time by that point for games, as he has to make it back home in time for Shabbat. He leaves the office.")

#46) ("On September 25, 2015, Petitioner was sent his Termination #1, with further indication of this in a Notification of Personnel Action Effective September 28, 2015.")

PETITIONER'S ORIGINAL PETITION                                                                 31

A claim for Retaliation is therefore established in this case, as Petitioner was merely observing his protected religious activity in the process of doing his job, and as a direct result shown by a long series of pervasive harassment toward this protected activity, Petitioner was then terminated from his job.

### E. Constructive Discharge

*Pennsylvania State Police v. Suders,* 542 U.S. 129 (2004) sets out the standard for constructive discharge:

The Court focused its analysis around the framework established by *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, and *Faragher v. Boca Raton*, 524 U.S. 775., governing employer liability for sexual harassment by supervisors. *Id.,* at 143. Those decisions delineated two categories of hostile work environment claims: 1) harassment that "culminates in a tangible employment action," for which employers are strictly liable, *Ellerth,* 524 U.S. at 765; accord *Faragher,* 524 U.S., at 808, and 2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense. *Id.* The Court then went on to analyze how this test will apply to constructive discharge cases. "An employer is liable for the acts of its agent when the agent 'was aided in accomplishing the tort by the existence of the agency relation.'" *Id.,* at 144, quoting *Ellerth,* 524 U.S. at 758 (internal citations omitted). "We then identified 'a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate.'" *Id.*, quoting *Ellerth* at 760.  A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*, quoting *Ellerth* at 761. Unlike injuries that could equally be inflicted by a co-worker, tangible employment actions "fall within the special province of the

supervisor," who "has been empowered by the company as an agent to make economic decisions affecting other employees under his or her control." *Id.*, quoting *Ellerth* at 762. The tangible employment action is, in essential character, "an official act of the enterprise, a company act." *Id.* A supervisor's "power and authority invests his or her threatening conduct with a particular threatening character, and in this sense, a supervisor is always aided by the agency relation." *Id.*, quoting *Ellerth* at 763. To be sure, constructive discharge is functionally the same as an actual termination in damages-enhancing respects. *Id.*, at 148. Both "end the employer-employee relationship," and both "inflict...direct economic harm." *Id.*, quoting *Suders v. Easton,* 325 F.3d at 460 (CA3 2003).

*Suders v. Easton,* 325 F.3d 432, 434 (3rd Cir. 2003) further sets out the standard for constructive discharge:

In *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 887 (3d Cir. 1984), we first recognized that "acts of discrimination in violation of Title VII can make working conditions so intolerable that a reasonable employee would be forced to resign." "We hold that no finding of specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine." *Id,* citing *Goss. "*The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id, Goss* at 888. In adopting the objective standard, we held that a plaintiff-employee may prevail on a claim of constructive discharge by establishing that "conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Id.,* citing *Goss* at 887-88. Despite our rejection of an aggravating circumstances requirement, we have stated that a plaintiff claiming constructive discharge must demonstrate that the alleged discrimination surpasses "a threshold of 'intolerable conditions.'" *Id. See Duffy v. Paper Magic Group, Inc.,* 265 F.3d 163, 169 (3d Cir. 2001); *Connors v. Chrysler Financial Corp.,* 160 F.3d 971, 976 (3d Cir. 1998). In *Connors*, we noted that "Intolerability" is not established

by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision....rather "intolerability is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign," that is, whether he would have had no choice but to resign." *Id, Connors,* 160 F.3d at 976. We hold that a constructive discharge, when proved, constitutes a tangible employment action within the meaning of *Ellerth* and *Faragher*. *Id.,* at 461.

Here, as noted, *supra,* IV. C Hostile Work Environment, conditions were created that were entirely intolerable to Petitioner and any reasonable person in Petitioner's position would have felt compelled to not work in such environment and found it impossible to work in such environment.

Therefore, constructive discharge is established in this case.

## V. Damages

### 29 C.F.R. § 1614.501 Remedies and relief.

**(a)** When an agency, or the Commission, in an individual case of discrimination, finds that an applicant or an employee has been discriminated against, the agency shall provide full relief which shall include the following elements in appropriate circumstances:

**(1)** Notification to all employees of the agency in the affected facility of their right to be free of unlawful discrimination and assurance that the particular types of discrimination found will not recur;

**(2)** Commitment that corrective, curative or preventive action will be taken, or measures adopted, to ensure that violations of the law similar to those found will not recur;

**(3)** An unconditional offer to each identified victim of discrimination of placement in the position the person would have occupied but for the discrimination suffered by that person, or a substantially equivalent position;

**(4)** Payment to each identified victim of discrimination on a make whole basis for any loss of earnings the person may have suffered as a result of the discrimination; and

**(5)** Commitment that the agency shall cease from engaging in the specific unlawful employment practice found in the case.

**(b)** *Relief for an applicant.* (1)(i) When an agency, or the Commission, finds that an applicant for employment has been discriminated against, the agency shall offer the applicant the position that the applicant would have occupied absent discrimination or, if justified by the circumstances, a substantially equivalent position unless clear and convincing evidence indicates that the applicant

PETITIONER'S ORIGINAL PETITION                                                                    34

would not have been selected even absent the discrimination. The offer shall be made in writing. The individual shall have 15 days from receipt of the offer within which to accept or decline the offer. Failure to accept the offer within the 15-day period will be considered a declination of the offer, unless the individual can show that circumstances beyond his or her control prevented a response within the time limit.

**(ii)** If the offer is accepted, appointment shall be retroactive to the date the applicant would have been hired. Back pay, computed in the manner prescribed by 5 CFR 550.805, shall be awarded from the date the individual would have entered on duty until the date the individual actually enters on duty unless clear and convincing evidence indicates that the applicant would not have been selected even absent discrimination. Interest on back pay shall be included in the back pay computation where sovereign immunity has been waived. The individual shall be deemed to have performed service for the agency during this period for all purposes except for meeting service requirements for completion of a required probationary or trial period.

**(iii)** If the offer of employment is declined, the agency shall award the individual a sum equal to the back pay he or she would have received, computed in the manner prescribed by 5 CFR 550.805, from the date he or she would have been appointed until the date the offer was declined, subject to the limitation of paragraph (b)(3) of this section. Interest on back pay shall be included in the back pay computation. The agency shall inform the applicant, in its offer of employment, of the right to this award in the event the offer is declined.

**(2)** When an agency, or the Commission, finds that discrimination existed at the time the applicant was considered for employment but also finds by clear and convincing evidence that the applicant would not have been hired even absent discrimination, the agency shall nevertheless take all steps necessary to eliminate the discriminatory practice and ensure it does not recur.

**(3)** Back pay under this paragraph (b) for complaints under title VII or the Rehabilitation Act may not extend from a date earlier than two years prior to the date on which the complaint was initially filed by the applicant.

**(c)** *Relief for an employee.* When an agency, or the Commission, finds that an employee of the agency was discriminated against, the agency shall provide relief, which shall include, but need not be limited to, one or more of the following actions:

**(1)** Nondiscriminatory placement, with back pay computed in the manner prescribed by 5 CFR 550.805, unless clear and convincing evidence contained in the record demonstrates that the personnel action would have been taken even absent the discrimination. Interest on back pay shall be included in the back pay computation where sovereign immunity has been waived. The back pay liability under title VII or the Rehabilitation Act is limited to two years prior to the date the discrimination complaint was filed.

**(2)** If clear and convincing evidence indicates that, although discrimination existed at the time the personnel action was taken, the personnel action would have been taken even absent discrimination, the agency shall nevertheless eliminate any discriminatory practice and ensure it does not recur.

**(3)** Cancellation of an unwarranted personnel action and restoration of the employee.

**(4)** Expunction from the agency's records of any adverse materials relating to the discriminatory employment practice.

**(5)** Full opportunity to participate in the employee benefit denied (e.g., training, preferential work assignments, overtime scheduling).

**(d)** The agency has the burden of proving by a preponderance of the evidence that the Petitioner has failed to mitigate his or her damages.

**(e)** *Attorney's fees or costs* -

**(1)** *Awards of attorney's fees or costs.* The provisions of this paragraph relating to the award of attorney's fees or costs shall apply to allegations of discrimination prohibited by title VII and the Rehabilitation Act. In a decision or final action, the agency, administrative judge, or Commission may award the applicant or employee reasonable attorney's fees (including expert witness fees) and other costs incurred in the processing of the complaint.

**(i)** A finding of discrimination raises a presumption of entitlement to an award of attorney's fees.

**(ii)** Any award of attorney's fees or costs shall be paid by the agency.

**(iii)** Attorney's fees are allowable only for the services of members of the Bar and law clerks, paralegals or law students under the supervision of members of the Bar, except that no award is allowable for the services of any employee of the Federal Government.

**(iv)** Attorney's fees shall be paid for services performed by an attorney after the filing of a written complaint, provided that the attorney provides reasonable notice of representation to the agency, administrative judge or Commission, except that fees are allowable for a reasonable period of time prior to the notification of representation for any services performed in reaching a determination to represent the Petitioner. Agencies are not required to pay attorney's fees for services performed during the pre-complaint process, except that fees are allowable when the Commission affirms on appeal an administrative judge's decision finding discrimination after an agency takes final action by not implementing an administrative judge's decision. Written submissions to the agency that are signed by the representative shall be deemed to constitute notice of representation.


## VI. Conclusion

Defendant engaged in extreme bias and prejudice against Petitioner's protected religious observances as part of his USPS job. Defendant did this by interfering in his ability to do his job and abusing its authority to attempt compelling Petitioner to choose between his job and protected religious observances. This rampant harassment by Defendant forced Petitioner out of his promising career with the USPS. Defendant can only attempt to make excuses and downplay its illegal misconduct, attempt to

ignore the facts, and launch pejoratives at Petitioner in meager defense of its unacceptable, abusive, and damaging misconduct. Petitioner therefore warrants relief from the Court to recover from this unnecessary and unacceptable loss of a career.

## VII. Prayer

Wherefore, Petitioner prays for relief pursuant to 29 C.F.R. 1614.501, along with any other applicable relief available, compensatory and punitive damages, attorneys fees, and such other relief as may be deemed appropriate by the Court.

Respectfully submitted,

Recoverable Signature

X *Steven Fils*

Steven Fils

Signed by: d703e111-c937-4c41-85ec-da0370fe73a3

Pro Se
23 Windsor Mews
Cherry Hill, NJ 08002
732-666-4963
filssteven@gmail.com

Certificate of Service

I hereby certify that a copy of the foregoing document has been served on the following counsel on January 24, 2023:

David Friedman
Agency Attorney
United States Postal Service
Northeast Area Law Department – NY Office
90 Church Street, Suite 3300
New York, NY 10007-2993
Tel (212) 330-5425
Fax (212) 330-5430
david.s.friedman@usps.gov

Recoverable Signature

X _Steven Fils_____

Steven Fils

Signed by: d703e111-c937-4c41-85ec-da0370fe73a3

PETITIONER'S ORIGINAL PETITION                                                    38